delivering the opinion of the Court, after stating the case as above:
It must be admitted that if a judgment for or against the defendant would be evidence against Bardin, the principal in the note, in an action against him by the plaintiff, or in an action against him by the defendant for indemnity after payment of a judgment against him, then Bardin would be interested in the result of the action, and would be an incompetent witness at common law, whether the payee of the note was dead or not.
This proposition embraces two distinct and different questions:
First. Would a judgment on the plea of payment for or against the sureties have been evidence in an action by the present plaintiff, the assignee of the note, against the principal? There is some conflict of authorities on this question. By accepting the decisions of this Court as controlling upon us, we consider that independent of the act of 1844 (Rev. Code. ch. 44, sec. 10) it would not be.
McKellar v. Bowell, 11 N.C. 34, was argued on opposite sides by Ruffin and Gaston, and the opinion of Chief Justice Taylor is distinguished by its good sense and learning. It was then held that the record of a recovery against a guardian was not evidence in an action brought by the plaintiff in that action on the guardian bond.
In Armistead v. Harramond, 11 N.C. 339, it was held that a judgment against an administrator for a debt of his intestate was in an action against his sureties upon the administration bond, evidence ofthe debt, but not that the administrator had assets to discharge it. In S. v. Fullenwider, 26 N.C. 364, it was held that the receipt of a constable for a claim to collect was not evidence against the sureties to his bond. See, also, Bullinger v. Allen, 15 N.C. 358; (253) 1 Greenleaf Ev., sec. 539a, (12 Ed.); Chairman v. Clark, 11 N.C. 43;Governor v. Montford, 23 N.C. 155; Governor v. Carter,25 N.C. 338; Ives v. Jones, ib., 538; Gaither v. Teague, 26 N.C. 65.
The act of 1844 is confined to actions on the official bonds of clerks, etc., executors, etc., and has no bearing on the question in the present case.
Second. Would a judgment against the sureties in the present action be evidence for them in an action by them against the principal for indemnity? *Page 192 
In our opinion, independent of the circumstances that the principal had notice of the present action against his sureties, and either did defend it or might have done so, the record of a judgment against the sureties would be evidence that they were compelled to pay on the note recovered on, and of the amount that they were so compelled to pay. 1 Greenleaf Ev., sec. 537.
In the present case the principal, B. T. Bardin, had notice of the action against his surety, and either did defend it or was entitled to do so.
He was therefore a privy to the judgment, and would be estopped in an action by his sureties for indemnity, to set up anything to defeat the action which would have availed as a defense in the action against the sureties. Rawle on Covenants for Title, 210; Bigelow on Estoppel, 65;Duffield v. Scott, 3 Tenn. 374; Love v. Gibson, 2 Fla. 598; Smith v.Crompton, 3 Barn. Ad., 407; Littleton v. Richardson, 34 N. H., 179-187.
By the common law he was incompetent in the present action to prove payment by reason of an interest in the result. The Code of Civil Procedure (Bat. Rev., ch. 17, sec. 342) abolishes, in general, the disqualification of interest. But sec. 343 provides that no person who has an interest to be affected by the result of an action shall be examined in regard to any transaction or communication with a (254) person at the time of such examination deceased, etc., as a witness against a party then prosecuting the action as assignee, etc., of the deceased.
The proposed witness comes within the letter of the prohibition in this proviso, and no less clearly within the mischief intended to be provided against.
Long before the adoption of our present rules of evidence by the State of New York, eminent writers on the theory of evidence had taught that the rules of common law governing its admission were too narrow. They had been framed rather with the view of excluding falsehood than of ascertaining the truth. They supposed an incapability of jurors to distinguish the false from the truth in conflicting testimony, which experience, in modern times at least, has contradicted. Interest had never been a disqualification from testifying in the civil law. In conformity to these enlightened doctrines the State of New York, and subsequently England and most of the American States, remodeled their rules of evidence in the direction of greater liberality in admitting witnesses to be heard by the triers of facts. It was thought that parties and persons interested might safely be permitted to testify concerning any transaction between them. It was expected that their testimony would sometimes be willfully false and *Page 193 
perjured, and that in general it would be partial, that some things would be suppressed, some exaggerated and twisted out of their rights meaning and significance, and that the truth would come, even from honest witnesses, colored by their interests, prejudices and feelings. In short, no more was expected of human nature than it is usually found to give. But it was thought that, notwithstanding this, the intelligence of a jury could be trusted to distill the truth from its mixture with falsehood, provided both parties to the transaction could speak. So far as I know, no writer, either professional or merely philosophic, ever proposed that one party to a transaction should testify concerning it, when the other from death or incapacity could not. In such a case there could, in general, be no check (255) on falsehood, no means, of correcting or explaining the testimony of the surviving party. Except in the rare cases in which its falsity might be demonstrated from its improbability, it must be received as the pure truth with all the suppressions, omissions, discolorations, exaggerations and distortions, which experience has shown to be almost inevitable in ex parte statements, when without restraint by fear of contradiction. Such an unlimited license to testimony would imply a confidence in the truthfulness and unselfishness of men which is not justified by the experience of any age. It would expose, without the possibility of defense, the estates of all persons deceased or otherwise incapacitated, to be plundered by the unscrupulous, and also by all of that class of men — a not very uncommon one — who, while not consciously false, are deluded by their selfish passions into believing things which have no foundation in fact, or who state real occurrences in so partial, exaggerated and distorted a way as to produce all the effects of falsehood.
In the present case, for aught that we can know, the guardian, if living, would deny the alleged payment to him.
The Code not only never intended to make competent against a deceased party to an action a witness who by reason of interest would have been incompetent at common law against a living party, but it apparently excludes some who would not have been excluded at common law.
In our opinion the witness was incompetent and in rejecting his testimony there was
PER CURIAM. No error.
Cited: Hare v. Grant, 77 N.C. 204; Peebles v. Stanly, ib., 245; Leak v.Covington, 99 N.C. 562; Moore v. Smith, 116 N.C. 669; McGowan v.Davenport, 134 N.C. 528, 529. *Page 194 
(256)